UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JASON GOODE,
        Plaintiff,

    v.                                  Case No. 3:10CV1734(SRU)

ANTHONY J. BRUNO, et al.,
        Defendants.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Jason Goode, currently incarcerated at Cheshire Correctional Institution ("Cheshire"), commenced this civil rights action *pro se* against Commissioner of the Department of Correction Brian Murphy, Director of Religious Services Anthony Bruno, and Directors of Programs and Treatment Mary Marcial and Patrick Hynes. On April 6, 2011, I dismissed the claims for monetary damages against all defendants in their official capacities. I also concluded that the claims under the Free Exercise Clause of the First Amendment, the claims under the Equal Protection Clause of the Fourteenth Amendment, and the claims brought pursuant to section 3 of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1, should proceed against the defendants.

On April 19, 2012, Goode filed an Amended Complaint naming Bruno as the only defendant. On January 8, 2013, Goode filed a Second Amended Complaint naming Bruno as the only defendant. Bruno has moved for summary judgment. For the reasons that follow, the defendant's motion is granted in part and denied in part.

**I.**     **Standard of Review**

With a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that he is entitled to judgment as a

matter of law.  *See* Rule 56(a), Fed. R. Civ. P.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The moving party may satisfy that burden by demonstrating the lack of evidence to support the nonmoving party's case.  *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When ruling on a motion for summary judgment, the court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).  An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it.  *Anderson*, 477 U.S. at 248.  "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or present mere speculation or conjecture.  *See Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (quotations and citations omitted).  The mere of existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for him. *See Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004).  If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, however, summary judgment is improper.  *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83

(2d Cir. 2004).

Where one party is proceeding *pro se*, the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## II.     Facts[1]

A jury convicted Goode of murder in March 1994 and he is serving a thirty-five year sentence. As of December 2012, Goode had been issued 164 disciplinary reports. On May 1, 2007, he was issued a disciplinary report for assaulting another inmate. A prison official subsequently found him guilty of assault and transferred the plaintiff to Northern Correctional Institution ("Northern"). On May 31, 2007, a hearing was held at Northern to determine if Goode should be placed in administrative segregation based on the charge of assaulting another inmate at Cheshire. The hearing officer recommended that Goode be placed in administrative segregation and, on June 5, 2007, the Director of Offender Classification and Program Management authorized Goode's placement in administrative segregation. Inmates in the administrative segregation program must complete three phases. Goode was placed in phase one of the administrative segregation program on June 5, 2007.

During his confinement in the administrative segregation program from June 2007 to

---

[1] The facts are taken from defendant's Local Rule 56(a)1 Statement [Doc. No. 107-5] and the exhibits and affidavits in support of that Statement [Docs. Nos. 107-2 to 107-4] and plaintiff's Local Rule 56(a)2 Statement and supporting exhibits [Doc. No. 112-1 to 112-5] and plaintiff's Affidavit [Doc. No. 112-6].

June 2012, prison officials issued Goode seventy-nine disciplinary reports. In order to advance to the second phase of the administrative segregation program, an inmate must remain disciplinary report free. In phase one, privileges, including the retention of property items, are restricted. Inmates in phase one are not permitted to participate in congregate religious services. Facility chaplains tour each unit at least once a week. Inmates are permitted to request individual pastoral counseling or an individual professional clergy visit from a clergy person who is approved to visit the facility.

As of November 6, 2012, Goode was in phase two of the administrative segregation program. On that date, prison officials at Northern transferred him to Cheshire because phase two of the administrative segregation program had been moved to Cheshire.

Reverend Anthony Bruno is a Catholic priest and has been employed as the Director of Religious Services for the State of Connecticut Department of Correction since April 1999. His responsibilities as Director of Religious Services include general administrative supervision of staff chaplains and inmate compliance with State of Connecticut Department of Correction Administrative Directive 10.8.

Goode signed a Department of Correction Religious Designation Form designating his religion as Wiccan at some point prior to mid-April 2005. On March 19, 2009, he sent a letter to Bruno requesting permission to participate in religious holidays and other ritual days as well as to purchase and possess items to be used in practicing his religion. He characterized the practice of religion as individualized and eclectic.

Goode sought to observe eight seasonal holidays, to participate in weekly or bi-weekly rituals to honor deities and engage in spiritual development, to perform other rituals over a four-

4

to seven-day period, to be permitted to use a space to burn incense and herbs either inside or outside the prison, to purchase and use Magical Tattwa cards for psychic development and to purchase a wand, chalice, altar pentagram, bell, two bowls, a 3 inch inscribing pen, four- to five-foot wooden table, the Book of Shadows, incense and candle holders, a candle snuffer, a drawstring bag, scented oils, candles, incense, herbs, powders, spices, dust, ritual liquids, parchment, gemstones, crystals and precious metals.  Goode acknowledged that he would not keep the religious items, including the herbs, oils, powders, ritual liquids, incense and candles in his cell, these items would be stored by the Department of Correction in a secure place,  he would only be permitted to use the items during the religious ceremonies/rituals and that the items would be returned to storage after each ceremony.

On April 15, 2009, Goode sent a second letter to Bruno again seeking the Magical Tattwa cards and attaching a written note from a practicing Wiccan Priestess and a written description of the Magical Tattwa cards from a magazine. On April 30, 2009, Bruno responded to Goode's letters.  He informed Goode that he should submit his request for items he sought to purchase that were not available from the commissary on a special form.  Bruno informed Goode that there were no congregate services for Wiccans but that he could practice his religion, including the eight seasonal holidays and weekly/bi-weekly rituals individually in his cell using books and tapes. He could also request that a member of his religion from the community come to the prison to assist him in practicing his religion.  He denied Goode's request for a separate place to practice his religion outside of his cell, either within the prison or outside of the prison, because it would set him apart from other inmates and was not required by his religion.  He also denied his request for the Magical Tattwa cards because they pertained to the Hindu religion and not the

Wiccan religion. Bruno noted that Goode already possessed Rider Waite Tarot cards.

On July 14, 2009, Goode submitted his request to purchase religious items not sold in the prison commissary to Bruno. These requests included: a buffalo horn athame, brass pentacle altar, a brass chalice, a brass candle snuffer, a mahogany wand, a silver bell, a silver candle holders, incense holders, two ceramic bowls, a three inch inscribing pen, a black velveteen bag, a three-foot wooden table to be used as an altar, herbs, essential oils, stick incense, candles, gemstones, the Book of Shadows and Magical Tattwa cards.

On July 20, 2009, Bruno responded to Goode's requests. Bruno told Goode that he could purchase the Book of Shadows pursuant to the Administrative Directive governing Inmate Communications, but he would not be approving the purchase of Magical Tattwas cards because the plaintiff already possessed Tarot cards. The requests for powders, spices, gemstones, herbs, oils, stick incense and candles were previously denied and the requests for dust and liquids were denied for the same reasons, the requests for candle and incense holders and a candle snuffer were denied because the candles and incense had been denied, the request for a dagger/athame, ceramic bowls and an inscribing pen were denied due to safety and security concerns, the request for a bell, chalice and table were denied because they were not personal religious items and the bag was denied because it could be used to hide contraband. Bruno indicated that the wand might be permitted as a personal religious item, but it could not be larger than a pencil. He noted that a decision about the wand would be made when more information became available.[2]

### III.  Discussion

---

[2] The parties make reference to a request made by the plaintiff in June 2010 for a black, hooded cloak and astral projection kit. That request was not included in the plaintiff's second amended complaint. Thus, it is not before the court.

The defendant includes three arguments in support of his motion for summary judgment. He contends that: (1) RLUIPA does not provide for money damages from the defendant in any capacity; (2) qualified immunity bars the First Amendment claims for money damages; (3) injunctive relief should be denied as a matter of law because it requires the court to intrude in the day-to-day operations of prison life and is not narrowly tailored.

### A.   RLUIPA - Money Damages

Bruno argues that RLUIPA does not permit Goode to recover monetary damages against him in his individual and official capacities. RLUIPA protects inmates by providing that the government shall not "impose a substantial burden" on the "religious exercise" of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means. 42 U.S.C. § 2000cc-1(a).

Goode states in his Second Amended Complaint that he only seeks monetary damages from Bruno in his individual capacity for violations of his First and Fourteenth Amendment rights. (*See* Second Am. Compl., Doc. No. 110 at 3.) With regard to his claims under RLUIPA, Goode only seeks injunctive relief. Even if Goode sought monetary relief for violations of RLUIPA, both the Supreme Court and the Court of Appeals for the Second Circuit have concluded that an individual cannot sustain a RLUIPA claim for money damages against a state or a state actor in his or her official capacity because sovereign immunity bars such a claim. *See Washington v. Gonyea*, 2013 WL 4792375, at *2 (2d Cir. Sept. 10, 2013) (citing *Sossaman v. Texas*, 131 S. Ct. 1651, 1663 (2011) ("States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver.")). Furthermore, the Second Circuit

has recently held that RLUIPA "does not create a private right of action against state officers in their individual capacities." *Id.* at *1. Accordingly, to the extent that Goode seeks monetary damages against the defendant in his individual or official capacity in connection with his RLUIPA claim, the motion for summary judgment is granted with respect to that claim.

### B.  First Amendment - Money Damages

Bruno argues that even if Goode has presented sufficient evidence to demonstrate that he violated plaintiff's right to exercise his Wiccan beliefs, he is entitled to qualified immunity. The defendant has the burden of proving the affirmative defense of qualified immunity at summary judgment or at trial. *See Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013).

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine if an official is entitled to qualified immunity, the court determines (1) if the facts alleged or shown by the plaintiff state a violation of a constitutional right and (2) if the right is clearly established so that a reasonable official would have known that his conduct was unlawful. *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). A negative answer to either question means that immunity from monetary damages claims is appropriate. *Pearson*, 555 U.S. at 236. The Supreme Court has held that district courts have the discretion to choose which of the two prongs of the qualified immunity standard to decide first in view of the particular circumstances surrounding the case to be decided. *See id.* at 236.

Under the second prong, a right is clearly established if, "at the time of the challenged

conduct . . . every 'reasonable official would [have understood] that what he [was] doing violate[d] that right.'" *al-Kidd*, 131 S. Ct. at 2078 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). There is no requirement that a case directly on point have been decided, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* "A broad general proposition" does not constitute a clearly established right. *See Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012). Rather, the constitutional right allegedly violated must be established "in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Id.* (quoting *Anderson*, 483 U.S. at 640).

  The First Amendment to the United States Constitution provides, in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. It is well-established that an inmate has a First Amendment right to freely exercise his or her chosen religion. *See Cruz v. Beto*, 405 U.S. 319 (1972) (per curiam). That right is not unlimited and may be subject to restrictions based on valid penological objectives, including institutional safety and security. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). The Second Circuit has recognized that when assessing a First Amendment free exercise claim, the court must balance the constitutional rights of inmates with "the interests of prison officials charged with complex duties arising from administration of the penal system." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (internal quotation marks and citation omitted). The standard to be applied by courts to a free exercise claim is one of reasonableness and is less restrictive than the standard routinely applied to alleged violations of fundamental constitutional rights. *See id.* (citations omitted). A prison regulation that impinges on an inmate's right to freely exercise his religion is valid "if it is reasonably related to

legitimate penological interests." *O'Lone*, 482 U.S. at 349.  An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard.  *See Saluddin v. Goord*, 467 F.3d 263, 274, n.4 (2d Cir. 2006) (citations omitted).

To state a claim under the Free Exercise Clause of the First Amendment, a prisoner must make a threshold showing "that the disputed conduct substantially burden[ed] his sincerely held religious beliefs." *Saluddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006).  The determination whether an inmate's conduct is motivated by religious beliefs that are sincerely held is not based on the objective reasonableness of the inmate's belief.  Instead, the court must only consider "whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Ford*, 352 F.3d at 590.  Although the Second Circuit has held that an inmate is required to establish that the defendant's conduct substantially burdened his sincerely held religious beliefs, the extent of the burden that must be demonstrated has not been clearly delineated within the Circuit.  *See Washington v. Gonyea*, No. 11-980-CV, 2013 WL 4792413, at *3 (2d Cir. Sept. 10, 2013) (summary order) (noting that the contours of the substantial burden standard are not precisely drawn").

Once the plaintiff has established that his religious exercise has been burdened, the defendant is required to identify the legitimate penological interests that justify the challenged conduct.  *Ford*, 352 F.3d at 595.  The court evaluates the reasonableness of the challenged conduct or policy under a four-factor test:

> [1] whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; [2] whether prisoners have alternative means of exercising the burdened right; [3] the impact on guards, inmates, and prison resources of accommodating the right; and [4] the existence of alternative means of facilitating exercise of the right that have only

a de minimis adverse effect on valid penological interests.

*Saluddin*, 467 F.3d at 274 (citing *Turner v. Safley*, 482 U.S. 78, 90-91 (1987)).

Bruno's qualified immunity argument focuses on the second prong of the qualified immunity standard.[3] He contends that the First Amendment right asserted by the plaintiff was not clearly established.

Bruno does not dispute that Goode's beliefs in connection with the Wiccan religion are sincerely held.  Nor does he challenge the plaintiff's claim that his conduct burdened the plaintiff's First Amendment right to exercise his religion.  Goode identifies the right at issue as his First Amendment right to possess objects, participate in ceremonies and observe holidays that are part of his sincerely held religious beliefs and necessary to practice his religion.  Bruno does not identify or frame the right at issue in this case, but contends that there is no clearly established law in the Second Circuit or Supreme Court governing the facts and circumstances of this case.  The Supreme Court has held that in determining whether a defendant is entitled to qualified immunity, "the very act in question" need not "ha[ve] previously been held [to be]

---

[3]   Bruno partially addresses the first prong of the qualified immunity standard -- whether the plaintiff has stated a claim for a violation of his First Amendment right to exercise his religion.  Bruno seems to argue that he did not violate Goode's First Amendment rights because he provided him with an opportunity to practice his religion in his cell, by using books and tapes as well as the Rider Waite Tarot cards that Goode had purchased in 2005.  In addition, Bruno informed the plaintiff that he could identify a spiritual/religious advisor from the community with whom he could communicate in writing or through a personal visit.   Bruno also argues that he denied many of Goode's requests for religious objects on the basis of legitimate safety and security concerns.   Bruno, however, does not address all of the requests for religious items and services made by Goode, particularly those that were denied for reasons other than safety and security.  Furthermore, Bruno does not identify or apply all of the factors set forth in *O'Lone* and *Turner* to be considered in determining whether a prison official's conduct violated an inmate's First Amendment right to exercise his religion.   Thus, the defendant has not met his burden on the first prong of the qualified immunity standard.

unlawful," rather, "in light of pre-existing law the unlawfulness of the act must be apparent" to the defendant. *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (internal quotation marks and citation omitted). Although there are no Second Circuit or Supreme Court cases addressing religious claims by inmates who are Wiccans, the right of an inmate not to have prison officials burden the free exercise of his religion without some justification was clearly established in 2009 when Goode sent his requests to Bruno.

In support of his qualified immunity argument, Bruno makes reference to numerous cases deciding claims related to congregate religious services. He concludes that he is entitled to qualified immunity because the law in this area is "murky" and "clearly not established." Goode however, makes no request for congregate services and clearly indicated to Bruno that he only sought the opportunity to practice his religion as a solitary practitioner. Bruno has not sufficiently met his burden on the second prong of the qualified immunity standard. The motion for summary judgment is denied to the extent it is based on a claim of qualified immunity.

### C.     Injunctive Relief

Bruno argues that Goode's request for injunctive relief in connection with his First and Fourteenth Amendment claims and his claims under RLUIPA should be dismissed. On pages three and five of the Second Amended Complaint, Goode seeks injunctive relief in connection with both his First Amendment and RLUIPA claims. In addition, the fifth page of the Second Amended Complaint includes a request for declaratory relief. Goode does not specify the nature of either the declaratory or injunctive relief that he seeks from the defendant. (*See* Second Am. Complaint, Doc. No. 110 at 3, 5.)

Bruno argues that Goode's claim for injunctive relief is barred by the limitations on

injunctive relief set forth in 18 U.S.C. § 3626.  That statute sets forth parameters for the type and extent of injunctive relief that may be awarded to an inmate in a prison conditions case.   At this point, it is unclear what type of injunctive relief Goode seeks.  The fact that the plaintiff may seek relief that is not narrowly drawn or extends further than necessary or is not the least restrictive means necessary to correct the violation of the federal right at issue is not a reason to dismiss all claims for injunctive relief at this stage of the proceedings.  If Goode were to prevail in this action, the court would be constrained by the requirements set forth in 18 U.S.C. § 3626 in awarding injunctive relief against the defendant.   Bruno also argues that the court should deny the plaintiff's request for injunctive relief as a matter of law given that it would be dangerous to allow the plaintiff to possess the items that he seeks.  That argument does not address the standard for awarding injunctive relief.  Accordingly, the motion for summary judgment is denied with respect to the claims for injunctive relief under the First Amendment and RLUIPA.[4]

## IV.     Conclusion

The defendant's Motion for Summary Judgment [**doc. #31**] is **GRANTED** with respect to the claims for monetary damages under RLUIPA against the defendant in his individual and

---

[4] Although Goode's claims relate to his confinement in the administrative segregation program at Northern in 2009 and he is currently incarcerated at Cheshire, the court cannot conclude that his transfer has rendered his request for injunctive relief moot.  *See Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (exception for mootness doctrine for challenged actions that are "capable of repetition, yet evading review").  The exception to the mootness doctrine will be applied if "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [i]s a reasonable expectation that the same complaining party would be subjected to the same action."  *Id.*  The court concludes that the plaintiff's action meets this exception to the mootness doctrine.  *See Pugh v. Goord*, 571 F. Supp. 2d 477, 489 (S.D.N.Y. 2008).

official capacities; the Motion is **DENIED** with respect to the claims under the Free Exercise Clause of the First Amendment for money damages against the defendant in his individual capacity, the claims for injunctive and declaratory relief against the defendant in his official capacity and the claims under RLUIPA against the defendant in his official capacity.  In addition, the claims under the Equal Protection Clause of the Fourteenth Amendment remain pending because they were not addressed in the motion for summary judgment.

      **SO ORDERED** this 30th day of September 2013, at Bridgeport, Connecticut.

                                            /s/ Stefan R.Underhill
                                            Stefan R. Underhill
                                            United States District Judge